UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|

| M. Lindaya | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) ORDER RE MOTION FOR PRELIMINARY INJUNCTION (DKT. 13)**

## I. Introduction

On May 22, 2026, Jika, Inc., doing business as Skio ("Skio"), and Recharge LLC ("Recharge") (collectively, "Plaintiffs") brought this action against Loop Solutions, Inc. ("Loop" or "Defendant"). Dkt. 1 ("Complaint"). It arises out of advertising initiated by Defendant in response to Recharge's April 30, 2026 acquisition of Skio for $105 million. *Id.* ¶ 1.

The Complaint advances the following causes of action: (1) false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) tortious interference with contractual relations under California common law; (3) tortious interference with prospective economic advantage under California common law; (4) unfair competition in violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200; (5) false advertising in violation of the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500; and (6) trade libel under California common law. *Id.* ¶¶ 53–104.

On May 27, 2026, Defendant waived service pursuant to Fed. R. Civ. P. 4(d). Dkt. 12. On the same date, Plaintiffs filed a Motion for Preliminary Injunction. Dkt. 13 ("Motion"). The Motion seeks a preliminary injunction barring Defendant from the following: "making any false and deceptive statements in any advertising . . . claiming, suggesting, or otherwise implying" certain allegedly false propositions[1] and publishing or disseminating "false comparative advertising." Dkt. 13-21 at 2–4. It also would require Defendant to remove or disable public access to certain advertisements on Defendant's website, cease publication of certain advertisements and send corrective communications retracting claims that have been enjoined. *Id.* at 4–5.

---

[1] These propositions include that (a) "Skio will be sunset, deprecated, or otherwise made nonoperational"; (b) "Skio's customers will be forced to migrate to the Recharge platform"; (c) "Skio will raise or adjust prices, change pricing terms, or void or renegotiate existing pricing for Skio merchants following the acquisition"; (d) "Skio will reassign Customer Success Managers following its acquisition by Recharge"; (e) "Skio's customer support will deteriorate following its acquisition by Recharge"; (f) "Skio will stop shipping features that help its customers acquire and retain subscribers, or that Skio product features will be deprecated, removed, or materially altered following the acquisition"; (g) "Skio is no longer a viable or independent or standalone subscription-commerce platform, or that merchants' platform choice in the Shopify subscription-commerce market is limited to Loop or Recharge"; and (h) "Skio lacks features" that it in fact offers. Dkt. 13-21 at 3–4.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

On June 8, 2026, Defendant filed its opposition to the Motion. Dkt. 18. On June 17, 2026, Plaintiffs filed a reply. Dkt. 23.

A hearing on the Motion was held on July 13, 2026, and it was then taken under submission. Dkt. 27. For the reasons stated in this Order, the Motion is **DENIED**.

## II.    **Background**

### A.    Parties

Recharge is a Delaware corporation whose principal place of business is in Santa Monica, California. Dkt. 1 ¶ 9. Skio is a Delaware corporation whose principal place of business is also in Santa Monica, California. Dkt. 1 ¶ 8. Skio is wholly owned by Recharge. *Id.* Loop is a Delaware corporation whose principal place of business is in Sacramento, California. Dkt. 1 ¶ 10.

### B.    The Shopify Subscription Management Market

#### 1.    Background

Recharge, Skio, and Loop each provides software applications ("apps") for e-commerce subscription management on the Shopify platform.[2] The apps offered by the parties enable online merchants, who transact using Shopify, to turn one-time retail customers into long-term subscribers of products and services.

Recharge, according to its Chief Operating Officer Michael McArthur, is "one of the leading subscription commerce platforms for Shopify merchants . . . ." Dkt. 13-1 ¶¶ 1–2. It provides "tools for subscription management, recurring billing, subscriber acquisition, customer portals, churn[3] prevention, and analytics." *Id.* ¶ 2. With "more than 20,000 brands" in its portfolio, Recharge processes "over $20 billion in gross merchandise volume annually." *Id.* According to its advertising materials, Recharge "power[s] 71% of subscriptions sold on Shopify stores." Dkt. 18-1, Ex. 1.

Aidan Thibodeaux, the former Chief Executive Officer of Skio and the now-President of Recharge, declares that Skio provides services similar to those provided by Recharge for more than "one thousand brands," including various "well-known direct-to-consumer" brands. Dkt. 13-5 ¶¶ 1–2, 8. It offers a "subscription management platform" that enables Shopify merchants to place a "subscribe and save" widget on their product pages. *Id.* ¶ 5. That widget allows customers to "subscribe," *i.e.*,

---

[2] Shopify is a "commerce platform that helps [merchants] sell online and in person." Joe Hitchcock, *What is Shopify and How Does it Work?*, Shopify (Nov. 25, 2025), https://www.shopify.com/blog/what-is-shopify. Shopify allows merchants to "create [their] first ecommerce website" and incorporates various services, such as payment processing, shipping services, marketing services, customer support services, and credit and financial services. *Id.* Shopify has "millions of global . . . merchants," including brands such as Mattel, Heinz, Netflix, and others. *Id.* Shopify "powers around 12% of US ecommerce," and has facilitated "more than $1.4 trillion in sales" globally through the Shopify platform. *Id.*

[3] Churn is "a regular, quantifiable process or rate of change that occurs in a business over a period of time as existing customers are lost and new customers are added." *Churn*, Merriam-Webster, https://www.merriam-webster.com/dictionary/churn (last visited July 17, 2026).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

recurringly purchase, a product, rather than make a one-time purchase. *Id.* Skio had an annual recurring revenue of $35 million at the time of its acquisition. *Id.* ¶ 6.

Skio's app is "integrate[d] with Shopify's native checkout and subscription" services. *Id.* ¶ 10. Thus, Skio and Shopify are designed to work together in a "unified easy-to-use platform" that allows merchants to easily manage customer acquisition, retention, service, upsells, analytics and recurring billing. *See id.* In this manner, Skio:

> enables the merchant to charge the subscriber's card on the right schedule, retry failed payments and prompt for card updates when cards expire. Subscribers can click a link in an email and access an account page that allows them to skip a shipment, swap a product, change frequency, update their address or cancel without having to email customer support or enter a password. Skio also offers merchants a configurable flow so that when a subscriber clicks "cancel," the merchant can offer discounts, free gifts, pauses, product swaps or different frequencies to try to keep them. Merchants have access to dashboards that provide information about their subscriptions, including how subscriptions are growing, what the churn rates are, and which cancellation offers are working.

*Id.* ¶ 9.

Skio's core features include the following:

> (a) a no-code customer self-service portal; (b) passwordless subscriber login via SMS or email; (c) Build-a-Box bundle customization; (d) automated subscriber journey workflows, including welcome flows, upsells, and win-back sequences; (e) multi-step cancellation flows designed to convert cancellations into pauses or product swaps; (f) one-click checkout via Shopify's native checkout, including Shop Pay; and (g) real-time analytics, including monthly recurring revenue (MRR) and average order value tracking.

*Id.* ¶ 10.

Thibodeaux declares that Loop is a "direct competitor" of Skio in the Shopify subscription-management market. Dkt. 13-5 ¶ 18. Loop "offers many of the same products and services to the same category of merchants" as Skio, including "subscription management, customer portals, cancellation flows, dunning and payment recovery tools, bundle builders, and API integrations." *Id.* Loop's Co-Founder, Piyush Jain, declares that Loop is an "innovative, highly customizable native application" that helps merchants "turn customers into subscribers, increase revenue, grow average order value, turn cancellations into saved business, grow average order value [sic], turn subscribers into loyal fans, scale their business, and analyze metrics to see what is happening so that issues can be promptly addressed." Dkt. 18-1 ¶¶ 1, 5, 8. Jain declares that Loop's largest competitor is Recharge, which is the dominant firm in the market, and that Skio is its second largest competitor. *Id.* ¶ 11. He declares that more than 2400 brands use Loop's services. *Id.* ¶ 8. Many of these brands are "former Recharge customers who migrated . . . because of Loop's superior product and service, offered at a more competitive price." *Id.* ¶ 12.

According to Thibodeaux, Loop and Skio target the same "segment of mid-to-large direct-to-consumer brands" and compete "for the same pool of prospective merchants." Dkt. 13-5 ¶ 18. In contrast,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

Thibodeaux declares that Recharge serves "distinct segments" of the subscription-management market on Shopify. *Id.* ¶ 11. Historically, Recharge has "focused on larger, more established merchants" while Skio has targeted "younger, high-growth, and entrepreneurial" brands on Shopify. *Id.* However, there is evidence that customers view Recharge, Skio, and Loop as interchangeable and competing services. *See infra* § II.B.3 (summarizing reviews from customers describing migration from Recharge to Skio).

Pricing to customers varies among Recharge, Skio, and Loop. According to marketing materials prepared by Defendant, Recharge's Pro Plan charges $499 per month and 1.34% & $0.19 per transaction; Skio's Plan charges $599 per month and 1% & $0.20 per transaction; and Loop's Pro Plan charges $399 per month and 0.75% per transaction (and no flat per transaction fee). Dkt. 13-8 at 4. For a large business processing 10,000 subscription orders per month, with an average order value of $50, subscription-management costs would be $7599 per month for Skio, $9099 per month for Recharge, and $4149 per month for Loop. *See id.* at 6.

### 2.      Customer Characteristics

As noted, the customers served by Recharge, Skio, and Loop are online merchants of goods and services who transact with retail customers using the Shopify platform. According to Jain, Loop's customers are "sophisticated market players" because they are "business owners, not average consumers." Dkt. 18-1 ¶ 6. Because Loop's customers are sophisticated, Jain declares that they are not "likely to make decisions quickly based on" advertising because merchants typically "engage in thorough research regarding" platform choices. *Id.* ¶ 6. The choice of what subscription-management service to use is a significant and long-term decision because it involves "technical integration, long term support, and pricing" decisions. *Id.* Based on these characteristics of Loop's customers, Jain declares that it "can take weeks or months of back-and-forth negotiation" before a merchant chooses to use Loop for its subscription-management needs. *Id.* ¶ 7.

Plaintiffs have proffered no evidence to contest Jain's testimony. Indeed, Thibodeaux's testimony about Skio's customers is consistent with Jain's testimony that the relevant customers are sophisticated and influenced by long-run business considerations. *See* Dkt. 13-5 ¶ 52 (Skio merchants subscribe for an average of 20 months); *id.* ¶ 56 (one potential Skio merchant evaluated Skio for a month before making a purchasing decision); *id.* ¶ 62 ("Merchants undertake [migration] costs [in moving from one platform to another] because they expect the destination platform to support their subscription business for the long term."); *id.* (migrating from one platform to another is a "substantial undertaking"). Moreover, the pricing of the services offered by the parties also supports the inference that the relevant customers are sophisticated decision makers.

### 3.      Customer Perceptions

Defendant has submitted evidence of customer dissatisfaction with Recharge's app. Out of 2157 total reviews for Recharge on the Shopify App Store, on a scale of 1 to 5, there were 117 1-star reviews for Recharge, which is more than 5% of total reviews. Dkt. 18-3 ¶ 27; *id.*, Ex. 11. These reviews generally concern Recharge's pricing and customer service. Some examples include: (1) "Started using this app many years ago when they had fair pricing. Now we are locked into them since we cannot easily move subscribers, and they have massively raised prices while doing nothing"; (2) "[R]echarge price went up but I'm not seeing the benefit"; (3) "[T]he unexpected price increase and the lack of care and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

communication with our business have diminished its value. Like many others, I was not informed of the planned price hike, and the dismissive response I received when I inquired confirmed that it was time to move on"; (4) "Support team is generally lazy, lacking ownership, slow, and unresponsive"; and (5) "Terrible app. . . . we're now going through the painful process of migrating to someone else. So far, [S]kio seems like a good option." Dkt. 18-3, Ex. 11.

Skio's Shopify reviews reflect that many Skio merchants reported that they elected to migrate from Recharge to Skio based on problems with Recharge's app. Dkt. 18-3, Ex. 13. Examples of these reviews include: (1) "We used Recharge a few years ago but encountered several issues. That's when we had the opportunity to connect with Kennan (Skio's founder), who helped us migrate to Skio. . . . Even as Skio has grown . . . their customer service has remained exceptional"; (2) "Skio's tech features are superb which is why we moved to them from [R]echarge"; (3) "We switched over from Re[c]harge because we couldn't answer simple questions like: 'What's the average number of subscription orders?' and 'what's the subscriber LTV over 6 months? 12 months?' We switched to Skio, and bam, easy as pie"; (4) "We just migrated to Skio, away from Recharge, and we're very impressed with the product and the team behind it"; (5) "If you're looking for a Shopify subscription platform, Skio is the one. We migrated across to them from Recharge"; and (6) "We moved from recharge to [S]kio and it's a way better UI/UX for our customers." *Id.*

In contrast to Recharge, Loop has five 1-star reviews out of 670 total reviews, which is less than 0.75% of total reviews. Dkt. 18-3, Ex. 12.

### 4. Shopify Policies

Pursuant to § 1.1.5 of Shopify's "App Store requirements," Shopify Developers[4] must "[c]reate unique apps" and are prohibited from publishing an app that is "identical to other apps you've published to the Shopify App Store." *See* Dkt. 18-2, Ex. 7. Section 1.1.5 also refers to the Shopify Partner Program Agreement, which provides, in relevant part, that Developers may not "create multiple Applications that offer substantially the same services." *See* Dkt. 18-2, Ex. 8 § C.2.4.[5]

Recharge has acknowledged that its acquisition of Skio could raise questions about the application of these policies. In response to the announcement by Recharge CEO's about the Skio acquisition on X (formerly known as Twitter), one user commented: "how does this work out on the [Shopify] app store? afaik [as far as I know], you're not allowed to have two products in the same category." Dkt. 18-2 ¶ 25. The CEO responded: "Tomorrow[']s problems we will figure out. Need a beer now to celebrate[.]" *Id.*

### 5. Competitive Dynamics in the Market

Udit Garg, Chief of Staff of Go Loop Solutions PVT LTD -- an affiliate entity that provides services to Loop -- declares that it is "very common for acquiring companies to consolidate or eliminate products that are redundant with their own." Dkt. 18-3 ¶ 5. Attached to his declaration are industry and academic

---

[4] A "Developer" is defined as a "Partner who has registered for a Partner Account via the Shopify Developer program page and develops Applications or Themes to integrate with the Service or places Ads in the Shopify App Store." Dkt. 18-2, Ex. 8 § A.1.
[5] Plaintiffs dispute the legal effect of these contractual provisions, but do not submit any countervailing evidence concerning them. *See* Dkt. 23 at 8.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

publications that report on acquisitions in which the acquiring company strategically "kills off" the acquired company to preempt possible future competition. *See* Barry Glauberman, *Navigating the M&A Landscape: Strategic Success for Tech CEOs,* Gartner.com (June 6, 2025), https://www.gartner.com /en/articles/mergers-and-acquisitions ("Minimize risk by focusing due diligence and integration efforts on overlapping product lines. Carefully rationalize or eliminate redundant products."); Colleen Cunningham, Florian Ederer & Song Ma, *Killer Acquisitions*, 129 J. Pol. Econ. 649, 649 (2021) ("This paper argues that incumbent firms may acquire innovative targets solely to discontinue the target's innovation projects and preempt future competition. We call such acquisitions 'killer acquisitions.'").

Garg also provides evidence of "killer acquisitions" in the Shopify industry. For example, after Shopify acquired a "drop shipping app" in the second quarter of 2017, it ultimately discontinued that app on May 12, 2022. Dkt. 18-3 ¶ 8; Dkt. 18-3, Ex. 16. Similarly, after Recharge acquired ElectricSMS in June 2021, Recharge "ultimately sunset the product and rolled its features" into Recharge's own product. Dkt. 18-3 ¶ 9; Dkt. 18-3, Ex. 17. In 2024, Recharge acquired Rodeo, which was another subscription-management Shopify app; according to Rodeo's former founder, the app was later "wound" down when "Shopify started building a native solution." Dkt. 18-3 ¶ 10; Dkt. 18-3, Exs. 18–19.

      C.      Recharge's Acquisition of Skio

As noted, Skio was acquired by Recharge on April 30, 2026 for $105 million. Dkt. 13-5 ¶ 2; Dkt. 13-1 ¶ 3; *see also* Dkt. 1 ¶ 8 ("Skio is a wholly-owned subsidiary of Recharge."). Thibodeaux declares that the acquisition "represents Recharge's commitment to expanding and strengthening the subscription commerce ecosystem for Shopify merchants." Dkt. 13-5 ¶ 13.

      1.      <u>Announcement of the Acquisition</u>

On April 30, 2026, Recharge issued a press release announcing its acquisition of Skio. Dkt. 13-5 ¶ 13. That same day, Recharge also published a post on its blog titled "Recharge welcomes Skio to build the future of subscription commerce." Dkt. 13-2 ("Recharge Post"). The Recharge Post states, in relevant part:

> For merchants on both platforms, **nothing is changing today**. Both Recharge and Skio will continue to operate as they have, and your existing team remains your point of contact. Over the coming months, we'll be reviewing elements of both platforms to bring you new innovation to help you grow and retain your customers. Every decision we make as we bring these platforms together will be made with you at the forefront.
>
> More details on the combined roadmap are coming in the months ahead.

*Id.* at 2 (emphasis in original).

/ / /

/ / /

/ / /

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

That same day, Thibodeaux published a post on Skio's blog titled "The Best Teams in Subscriptions, Together." Dkt. 13-6 ("Skio Post"). The Skio Post states, in relevant part:

> **What happens next**
>
> For Skio + Recharge merchants: you get access to the best subscription platform.
>
> We're preserving (and continuing to ship new features on!) both platforms while we figure out the best path forward. Over the next ~12 months, we'll be working with Recharge to combine the best of both; your input will directly shape the future of subscription management.
>
> Your Merchant Success Manager remains your point of contact, we'll keep shipping killer new features, and nothing changes operationally until we have something better to show you.

*Id.* at 2 (emphasis in original).

### 2.    Customer Reactions to the Acquisition and Skio's Response

Following the acquisition announcement, Thibodeaux declares that "many Skio customers" expressed "concern[] about what would happen after the acquisition." Dkt. 13-5 ¶ 14. Based on Thibodeaux's personal communications with certain of these customers, he declares that Skio's customers "did not want to migrate to Recharge's platform, did not want their pricing to change and did not want to lose their customer service managers and support." *Id.* Jain similarly declares that merchants immediately "began contacting Loop" following the acquisition announcement "because they were uncertain about their platform's future . . . ." Dkt. 18-1 ¶ 19.

To address these concerns, Thibodeaux and Recharge's "senior management," who are not identified by name, decided to offer what Plaintiffs characterize as a "no change" guarantee. Dkt. 13-5 ¶ 15. In May 2026,[6] Thibodeaux published a post on his LinkedIn profile announcing the purported "no change" guarantee. Dkt. 13-7 ("LinkedIn Post"). The LinkedIn Post states, in relevant part:

> no Skio merchants will be forced to migrate to Recharge.
>
> . . .
>
> in (too) many acquisitions, customers get screwed.
>
> first come vague assurances, followed by a series of "customer-first" changes, and before you know it you're using a tool you didn't sign up for, working with unfamiliar faces, paying an amount you didn't agree to.

---

[6] Thibodeaux declares that the LinkedIn Post was published in "May 2026," but does not provide the exact publication date. Dkt. 13-5 ¶ 16.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

let me be clear: that just won't be the case here.

we understand how critical subscriptions are to the brands we support today, and would never do anything to jeopardize their programs.

to that end, we're offering the Skio + Recharge "no change" guarantee.

until 2028 (at the absolute earliest) we guarantee that:

- you won't be forced to migrate to the Recharge platform
- you'll keep your current MSM + Best-in-Class Support team
- your pricing will not be adjusted
- if you're mid-migration or in our sales process, we're happy to continue moving you to Skio
- we'll continue to ship features that help you acquire and retain subscribers

now, this doesn't mean that you WILL be forced to move over come 2028. frankly, we don't know what [S]kio or [R]echarge or (maybe even) some new platform is gonna look like in a year and a half.

but we want to let you build your business without worrying about us being there for you.

if you have questions/concerns/anything else, reach out.
it's what we're here for.

*Id.* at 2.

Thibodeaux declares that Recharge and Skio published this statement because they "understand[] how critical subscription infrastructure is to" their brands, and because they "recognized that [their] customers needed specific, verifiable assurances." Dkt. 13-5 ¶ 17.

Similarly, McArthur declares that Recharge has "guaranteed Skio customers that they can continue using the Skio platform on their existing terms through at least 2028," and that during that time period, Recharge will not force the migration of Skio customers to Recharge, will retain Skio customers' pricing, contacts, and customer support and will maintain existing features and continue to ship new features. Dkt. 13-1 ¶ 5. McArthur also declares that Recharge intends to "continue investing in Skio's platform and product development for the benefit of current and prospective Skio merchants." *Id.*

In response to the Recharge CEO's announcement of the acquisition on X, one user commented: "That wasn't smart. Good luck to you. Won't be referring any clients to Recharge anymore." Dkt. 18-2 ¶ 24.

### 3. Post-Acquisition Changes to Skio

Vivek Agarwal, Co-Founder of Loop, declares that, since the announcement of the acquisition, Skio has introduced only three new features or feature improvements to its product. Dkt. 18-2 ¶ 26; Dkt. 18-2, Ex. 10 (Skio change log). In contrast, Skio introduced 13 new features or improvements in April 2026,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

and 19 new features or improvements in March 2026. Dkt. 18-2 ¶ 26; Dkt. 18-2, Ex. 10. Garg declares that, based on a review of Skio employees' publicly available LinkedIn profiles, at least nine of them have moved to Recharge following the acquisition. Dkt. 18-3 ¶¶ 11–20; *see also* Dkt. 18-3, Exs. 20–28.[7]

> D.     Loop's Advertising Campaign

As noted, Loop and Skio are "direct competitor[s]" that target the "same category of merchants" and "offer[] many of the same products and services." Dkt. 13-5 ¶ 18.

Thibodeaux declares that, in the days following the April 30, 2026 acquisition, Loop "launched a coordinated, multi-channel commercial outreach campaign targeting Skio's customers with false claims that Skio's platform is being discontinued, that their prices will increase and they will be migrated to Recharge." *Id.* ¶ 19. He declares that this campaign is "specifically designed to poach customers from Skio" because Loop has also featured, on its website, certain advertisements "specifically dedicated to 'customer success stories,' which assert that particular customers migrated from Recharge or Skio to Loop." *Id.* ¶ 45.[8]  In one example, Loop advertised that its customer, NutriPaw, experienced a growth in revenue from 5% to 28.6% over nine months after migrating from Recharge. *See* Dkt. 13-18.

Defendant generally denies that its advertising campaign was improper. Instead, Jain declares that "Loop used the market uncertainty created by the acquisition" as an opportunity "accurately [to] inform[] merchants" about their choices post-acquisition and what "typically happens in acquisitions of technology platforms." Dkt. 18-1 ¶ 20.

Each allegedly false advertisement (collectively, the "Advertising Campaign") identified by Plaintiffs as a basis for the injunctive relief requested is summarized in the following discussion.

> 1.     Acquisition Banner

"Shortly after the acquisition announcement," Loop "posted a site-wide banner" ("Acquisition Banner") "across its website at loopwork.co." Dkt. 13-5 ¶ 20; Dkt. 13-8 (screenshot of Acquisition Banner captured on May 14, 2026). The Acquisition Banner stated: "Recharge acquired Skio for $105M. Loop is now the second largest Shopify subscription app. Your choice just got simpler: **Loop or Recharge**. Book your priority migration slot." Dkt. 13-8 (emphasis in original).

Thibodeaux declares that the Acquisition Banner is false because it informed customers that "Skio is no longer a viable standalone platform" when, in fact, "Skio continues to operate as a standalone product," its customers are "not being migrated to Recharge" and there are "no plans to deprecate Skio." Dkt. 13-5 ¶ 21.

---

[7]  Plaintiffs dispute the legal effect of these facts, but not the facts themselves. *See* Dkt. 23 at 7–9.

[8]  Thibodeaux does not declare that these "customer success stories" are false or misleading. Nor have Plaintiffs argued that this material is a basis for injunctive relief.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

        2.     <u>Blog Post</u>

According to Jain, Loop maintains a blog on its website, loopwork.co. Dkt. 18-1 ¶ 9. Jain declares that Loop's blog includes the following disclaimer: "Editorial Independence: This content is published by Loop Subscriptions. While competitor information is sourced from public documentation, readers should conduct their own evaluation before making platform decisions." *Id.* (emphasis omitted). Loop's blog also invites competitors to contact Loop if they believe that any information contained on the blog is inaccurate: "Corrections: If you are a representative of a platform listed and believe any information is factually inaccurate, please contact us at contact@loopwork.co and we will review and correct promptly." *Id.* ¶ 10.

Thibodeaux declares that "[w]ithin days of the acquisition announcement, Loop published its first iteration of a blog post" ("Blog Post"). Dkt. 13-5 ¶ 22; Dkt. 13-8 (screenshot of first Blog Post captured on May 14, 2026). The Blog Post, which was authored by Devisha Rekhi and published on May 5, 2026, states, in relevant part:

> If you've been comparing Skio vs Recharge for your Shopify subscriptions, the decision just changed. If you're a current Skio merchant: your platform got absorbed by the competitor most Skio brands were specifically trying to avoid. If you're evaluating subscription apps for the first time: the choice just got simpler. Here's what the data says.
>
> **What does the Skio acquisition mean for merchants?**
>
> Recharge's official position: both platforms continue to operate as normal. Nothing changes immediately.
>
> But here's what historically happens when a platform gets acquired by its largest competitor:
>
> The acquiring company says "business as usual" for 6-12 months. Then feature roadmaps merge. Then pricing consolidates — usually upward. Then the smaller platform's app gets sunset or rolled into the acquirer's product. The merchants who waited get migrated on the acquirer's timeline, not their own.
>
> Skio merchants now face a set of questions nobody has answers to yet. Will Skio's $599/month pricing stay? Will the passwordless login and clean portal UX survive integration into Recharge's architecture? Will the small, responsive support team that Skio reviewers praised remain intact — or get absorbed into Recharge's support infrastructure, which its own reviewers have documented as slow and unresponsive?
>
> What that uncertainty looks like in practice depends on where you stand today.
>
> If you're currently on Skio:
>
> Your platform's future is now controlled by Recharge.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

. . .

If you're currently on Recharge:

The same pricing escalation and support patterns documented in 116 one-star reviews haven't changed. They've gotten bigger.

. . .

If you're evaluating platforms for the first time:

The decision just got simpler. It's Loop or Recharge.

Dkt. 13-8 at 3 (emphasis in original); Dkt. 18-2 ¶ 18.

Thibodeaux declares that the Blog Post contains various false statements because Recharge has not "merge[d]," "consolidate[d]" or "sunset" Skio's products, and has no plans to do so. Dkt. 13-5 ¶ 24. He also declares that the statement "Loop or Recharge" presents customers with a false choice because "Skio continues to operate" and remains available as a third alternative to Recharge and Loop. *Id.* Thibodeaux declares that the Blog Post "appear[s] calculated to amplify" the concerns raised by customers following the acquisition, which the LinkedIn Post was intended to address. *Id.* Thibodeaux also declares that the Blog Post falsely accuses Recharge of having a "pattern of pricing escalation" and a "pattern of support problems that has 'gotten bigger'" following the acquisition. *Id.* ¶ 25.[9] Finally, Thibodeaux declares that the claim that Recharge is "the competitor most Skio brands were specifically trying to avoid" is a false characterization of the motivations of Skio customers. *Id.* ¶ 26.

Thibodeaux declares that the Blog Post was revised on "several occasions, in versions dated approximately May 16, May 19, May 20, and May 21, 2026." *Id.* ¶ 36. Although the "exact language has changed," he declares that the "false core message" -- that "Skio customers must move to Loop because Skio's platform will be deprecated, its pricing will increase, its customer support will be cut and customers will be required to migrate to Recharge" -- "has not" changed. *Id.* These revisions included the following allegedly false statements:

- On May 16, 2026, the Blog Post was revised to include the following purportedly "new false and deceptive" claims: "'Skio's own leadership has been candid about this - in their words, 'we don't know what Skio or Recharge or (maybe even) some new platform is gonna look like in a year and a half.' That's an honest acknowledgment, not a criticism. But it does mean that the long-term shape of the platform - what it's called, who runs it, how it's built - is genuinely unknown beyond the guarantee window." Dkt. 13-13 at 3; Dkt. 13-5 ¶ 38. Thibodeaux declares that these statements are false because "Recharge intends to continue" operating Skio as an independent platform "on a long-term basis" and the 2028 window, announced in the LinkedIn post, is not the "outer limit of Recharge's commitment to Skio's customers." Dkt. 13-5 ¶ 39. He also declares that the May 16, 2026 version of the Blog Post "selectively quot[ed]" from the LinkedIn Post

---

[9] Thibodeaux does not dispute that Recharge currently has 117 one-star reviews, which represents more than 5% of all of its reviews.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

because the quoted material was a "general, forward-looking observation about the trajectory" of the industry as a whole, rather than a "statement about Skio's post-acquisition future" or a "retraction of the 'no change' guarantee" or an "acknowledgment . . . that the Skio platform may be sunset or fundamentally altered." *Id.* He also declares that the May 16, 2026 version of the Blog Post retained the following false statement from the original Blog Post: "If you're evaluating platforms for the first time: The decision just got simpler. It's Loop or Recharge." *Id.* ¶ 37; Dkt. 13-13 at 3.

- On May 19, 2026, the Blog Post was revised to include the following allegedly "false" claims: "The independent-platform shortlist is shorter than it was a month ago"; and "Beyond Recharge's initial 'nothing is changing today' statement, the long-term shape of the platform — what it's called, who runs it, how it's built — has not been publicly committed in either direction." Dkt. 13-14 at 2; Dkt. 13-5 ¶ 41. Again, Thibodeaux declares that these statements are false because Skio continues to operate, and will continue to operate, as a "standalone subscription platform," with Recharge having made "specific, public, written commitments" that Skio will continue to operate as a standalone product, that its customers will not be required to migrate, that its pricing will not change, that its CSMs will be retained, and that it will continue to "ship features through at least 2028." Dkt. 13-5 ¶ 41.

- On May 20, 2026 and 21, 2026, the Blog Post was again revised to include the following claim: "Your day-to-day hasn't changed — but the window after an acquisition is when many brands take a closer look at the long-term shape of their platform stack." Dkt. 13-5 ¶ 42; Dkts. 13-15 & 13-16. Thibodeaux declares that this statement is false because it sets forth an "unfounded prediction[] about the future of Skio" -- including that customers will face "inevitable price increases, feature deprecation, and product discontinuation" -- when, in fact, Recharge has committed to not making such changes and "intends to honor those commitments." Dkt. 13-5 ¶¶ 42–43.

Thibodeaux declares that, with each revision of the Blog Post, Loop has "removed some of the most aggressive false statements while introducing new false statements" and "Loop has not retracted any of the prior false statements" in the Blog Post. Dkt. 13-5 ¶ 64.

Agarwal declares that, from May 5, 2026 to the date the Motion was filed, 45 unique users visited the Blog Post, of which 22 were users from the United States, in comparison to 6994 unique visitors to Loop's website overall in the same period. Dkt. 18-2 ¶¶ 18–19. He also declares that "Loop is not aware of any merchant having visited" the Blog Post or "having elected to become a Loop merchant" as a result of it. *Id.* ¶ 18.

### 3. Direct Outreach to Skio's Customers

Thibodeaux declares that, beginning in May 2026, "Loop began a targeted outreach campaign to Skio's" customers featuring "false representations about Skio's post-acquisition trajectory." Dkt. 13-5 ¶ 27. This aspect of the Advertising Campaign included the following communications:

- On May 6, 2026, Harshit Gupta, a Loop sales representative, sent an email to a Skio customer. Dkt. 13-9 ("Gupta Email"). The Gupta Email included various statements that Thibodeaux

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

contends are false, including: "Whose roadmap wins? Skio's? ReCharge's? Features you use today could quietly get deprecated"; "Your negotiated rate doesn't always survive a merger. Renegotiation usually shows up faster than you'd think"; "Support and new feature requests usually slow down during a merger. The teams are heads-down on integration work, so day-to-day requests tend to wait a bit longer"; and "The CSM [customer success manager] you've built rapport with might get reassigned." *Id.* at 2; Dkt. 13-5 ¶ 29. Thibodeaux does not address an express limitation in the Gupta Email, which states: "Not saying any of this is happening tomorrow. Just worth keeping an eye on." Dkt. 13-9 at 2.

- On May 7, 2026, a Loop representative identified as "Emma" sent an email to a different Skio customer with the subject line: "Back to square one for your platform future." Dkt. 13-10 ("Emma Email"). The Emma Email states, in relevant part: "Here's what's happening: a couple of Skio customers have already started migrating. They're not waiting around." *Id.* at 2. Thibodeaux declares that these statements are false because there is "no ongoing migration of Skio merchants to Loop." Dkt. 13-5 ¶ 31.

- On some unspecified date between April 30, 2026 and May 8, 2026, Gupta sent a Skio customer a direct message on Slack that stated, in relevant part: "[W]ith Skio getting acquired now, things are going to change a lot there, open to revisit [L]oop?" Dkt. 13-11 ("Slack Messages"). On May 8, 2026, Gupta sent an additional message to that customer that stated in relevant part: "Based on general SaaS [software as a service] mergers, some common things happen," including: "CSMs gets reshuffled eventually"; "Negotiated pricing gets renegotiated"; "Priority given to the brands change as the merger happens down the months"; and "Features released and feature requests intake reduces/changes dramatically." *Id.* Thibodeaux declares that these statements are false because "Recharge has not made and does not plan to make material changes to Skio's operations" and has communicated that to its customers. Dkt. 13-5 ¶ 33. Again, Thibodeaux does not address the following express limitation in Gupta's message: "Not sure if all or even anything would happen with you but this is what generally happens." Dkt. 13-11.

Thibodeaux also declares that Loop has "continued to distribute the targeted email and Slack outreach" to Skio's customers. *Id.* ¶ 64.

    4.    <u>Comparison Table</u>

Thibodeaux declares that "Loop posted a side-by-side feature comparison page" ("Comparison Table") on its website in early May 2026. Dkt. 13-5 ¶ 34; Dkt. 13-12. This testimony is contested by Agarwal, who declares that the Comparison Table was published by Loop on its website for an 11-month period from June 24, 2025 to May 20, 2026. Dkt. 18-2 ¶ 6. Agarwal declares that the Comparison Table was not "posted in response" to the acquisition announcement. *Id.* According to Agarwal, although the Comparison Table was available for 11 months, Skio "never complained about" it until the acquisition. *Id.* ¶ 8. He also declares that the Comparison Table was "taken down" on May 20, 2026, before this action was filed. *Id.* ¶¶ 6, 8.

According to Thibodeaux, the Comparison Table "purported to compare 'Loop Pro' against a 'Skio Dog Plan' across 59 feature rows, marking numerous Skio features as unavailable (x) and those same

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

features for Loop as available (✓).” Dkt. 13-5 ¶ 34. Thibodeaux contends that the Comparison Table was false in that it claimed that Skio lacked the following features -- “Passwordless login via email,” “One-click checkout with exclusive offers,” “OTP-less [one-time-passcode-less] quick action authentication,” “PDP [product detail page]-specific subscription widgets,” “Multiple benefits pages based on customer profile,” “Profile-based cancellation reason ordering,” “Personalized discount offers by profile,” “Discount effectiveness analysis,” and “Proactive card expiration alerts” -- when Skio, in fact, offers these features. *Id.* ¶ 35. He also declares that Loop’s purported comparator, the Skio “Dog Plan,” is not “among any current plans offered by Skio.” *Id.*

Agarwal disputes Thibodeaux’s testimony as to the content of the Comparison Table. *First*, with respect to the “one-click checkout with exclusive offers” claim, Agarwal declares that Shopify allows for the native generation of “checkout URLs” on all platforms. Dkt. 18-2 ¶ 9. Thus, he declares that this statement instead referred to “Loop’s broader Checkout Links functionality,” which is different in “scope and functionality” from Skio’s tools, which rely on “Shopify-native” features. *Id. Second*, as to the PDP-specific subscription widgets statement, Agarwal declares that Skio itself does not offer any custom widget capabilities above and beyond those natively available in Shopify, in contrast to Loop, which does offer customization beyond what Shopify provides. *Id.* ¶¶ 10–11; *see also* Dkt. 18-2, Ex. 2 (documentation for Skio merchants describing how to use the “Shopify Customizer Tool” with Skio). *Third*, as to “cancellation flows” statements, Agarwal declares that these statements were true because, although Skio offers similar features, they are in “early release” and therefore, are not available out of the box and can only be acquired by contacting Skio. Dkt. 18-2 ¶ 12; *see also* Dkt. 18-2, Ex. 3 (documentation for Skio merchants: “Multiple Cancel Flows is currently in early release. Contact help@skio.com to enable Multiple Cancel Flows as your store will need to be migrated from the previous Cancel Flows version.”). Moreover, according to Agarwal, the cancellation flows of Loop and Skio are materially different because the “order of reasons for cancellation” shown to a customer is randomized in Skio, whereas Loop allows merchants to control the order of reasons presented. Dkt. 18-2 ¶ 13. *Fourth*, as to the “proactive card expiration alerts” statement, Agarwal declares that Skio does not provide a “one-toggle native feature” to alert merchants when its customers’ credit cards have expired. *Id.* ¶ 14. Instead, to enable this function, Skio merchants must “connect to another service provider.” *Id.* Although Skio allows merchants to be notified after a credit card charge fails, it does not provide “proactive” notifications for an upcoming expiration of a customer’s credit card. *Id. Fifth*, as to the “Dog Plan” claim, Agrawal states that Skio, at some time, offered a “Dog Plan,” which was “publicly discussed.” *Id.* ¶ 15; *see also* Dkt. 18-2, Ex. 6 (publicly available blog discussing Skio’s Dog Plan versus Skio’s Cat Plan). *Finally*, as to the “OTP-less authentication” and “Passwordless login via email” claims (“Password Claims”), Agarwal admits that the Comparison Table was in “error” in claiming that Skio lacked these features. Dkt. 18-2 ¶ 16.

Agarwal states that the Password Claims were an “inadvertent” error and Loop was unaware of them until this action was filed on May 22, 2026. *Id.* ¶¶ 16–17. As noted, the Comparison Table had been removed from Loop’s website before Plaintiffs filed this action. *Id.* ¶ 17. Other Loop advertisements accurately attributed a passwordless login feature to Skio. *See, e.g.*, Dkt. 13-8 at 2 (Blog Post: “Skio Subscriptions - $32M ARR, 234 Shopify App Store reviews, the subscription management app that DTC brands praised for its modern UX and passwordless login – is now a Recharge product.”).

Agarwal declares that the Comparison Table “received minimal traffic” during the 11-month period of its availability. Dkt. 18-2 ¶ 7. He is “not aware of any merchant specifically referencing or relying” upon the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

Comparison Table in making a purchasing decision or asking any questions about the Comparison Table. *Id.* Thus, he declares that Loop is not aware of "any merchant ever having relied" on or "having chosen to sign up with Loop" based on the Comparison Table. *Id.*

  E.    Impact of the Advertising Campaign

     1.    Customer Impact

Based on his experience as Chief Executive Officer for Skio, Thibodeaux declares that he is "familiar with how . . . merchants evaluate platforms." Dkt. 13-5 ¶ 47. According to Thibodeaux, they "weigh the future stability, pricing, support, and product features of the Skio platform when deciding whether to subscribe to Skio, remain on Skio, or migrate to another platform." *Id.* Because the Advertising Campaign addressed those factors and gave Skio's customers "concerns" about Skio's post-acquisition future, Thibodeaux declares that the Advertising Campaign has "caused harm to Skio and Recharge." *Id.* ¶¶ 46–47.

Following the Advertising Campaign, Thibodeaux declares that Skio and Recharge "have received over 10 inquiries from Skio merchants expressing concern about Skio's future, pricing, support continuity, and feature availability" following the acquisition. Dkt. 13-5 ¶ 48; Dkt. 13-19 (Emma Email). One customer informed Recharge that it had "received unsolicited emails from Loop that contained no identifying signature, footer, or other disclosure indicating that the messages came from Loop." Dkt. 13-5 ¶ 49. Because the email stated that the sender "wanted to get them started on migrating," the customer "initially believed the emails were coming from Recharge and called Recharge expressing concerns about Skio's post-acquisition future." *Id.* Based on that confusion, the merchant "asked whether Skio would continue to function as it does today or whether Skio customers would be migrated to Recharge's platform." *Id.*

Thibodeaux also declares that during a May 2026 industry conference, he spoke with five large merchants who "reported concerns that Loop representatives had been making statements about Skio and the Recharge acquisition consistent with the messaging in" the Advertising Campaign. *Id.* ¶ 50.

     2.    Lost Revenue and Customer Relationships

Thibodeaux declares that Skio generates revenue through recurring subscription fees paid by its customers. Dkt. 13-5 ¶ 51. Accordingly, when a Skio merchant cancels, declines to renew or migrates to a competitor, Skio "loses not only the value of" the customer's current business, but also the recurring revenue that the customer would have generated in the future. *Id.* ¶ 51; *see also id.* ¶ 52 (average Skio customer uses Skio's services for approximately 20 months). Customers who "raise concerns about a platform's continued operation, pricing, support, or product roadmap," according to Thibodeaux, are more likely than other customers to cancel, decline to renew, or migrate. *Id.* ¶ 51.

Thibodeaux declares that Skio and Recharge have "lost customer relationships and subscription revenues" because of the Advertising Campaign. *Id.* ¶ 53. He declares that Skio has "already identified lost prospective and current customers to Loop, resulting in the loss of hundreds of thousands of dollars in annual revenue." *Id.* Because "merchants are reevaluating their platform options" because of the Advertising Campaign, which remains ongoing as "additional Skio merchants and prospective Skio

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

merchants are exposed to these statements," Thibodeaux declares that this is "just the start" of Skio's ongoing loss of revenue and customer relationships. *Id.* ¶¶ 53–54.

To migrate from one platform to another is a "substantial undertaking for a merchant." *Id.* ¶ 62. Thibodeaux declares that the migration process requires "technical integration work, transfer of subscriber data and payment tokens, retraining of customer-facing and back-office teams, and adjustments to [customer]-facing flows." *Id.* Thus, once a merchant has "incurred those costs to migrate from Skio to another platform, the merchant rarely undertakes a second migration to return to Skio . . . ." *Id.* For these reasons, the loss of recurring revenue incurred when a customer migrates to a competitor "is generally not recoverable." *Id.*

Similarly, McArthur declares that the "competitive choices" made by customers "during transition periods . . . compound over years" because a customer who has migrated to Loop is unlikely to consider going back to Skio for several years. Dkt. 13-1 ¶ 19. Thus, the "harm caused by each merchant decision influenced by Loop's false statements cannot be recovered by a later award of damages alone." *Id.*

Thibodeaux declares that Skio has "tracked merchant inquiries, sales-pipeline activity, and renewal discussions" to determine the impact of the Advertising Campaign on Skio's ability to acquire new customers and retain existing ones. Dkt. 13-5 ¶ 57. He then declares that, on May 21, 2026, a potential customer -- who had expressed "strong interest in Skio" after "reviewing proposals, pricing, and demos" over a month-long period -- declined to sign with Skio after learning of the acquisition. *Id.* ¶ 56. That customer wrote:

> We were really impressed with Skio and felt a good level of alignment between Skio and [Customer]. However, the news that Skio merged with Recharge did catch us really off-guard! We felt a bit torn since we had pretty much disregarded Recharge completely by that point as we didn't enjoy the sales process, and the pricing was completely unrealistic for our brand.
>
> At this moment, we are progressing with Loop subscriptions, as we felt they also aligned with us, but they seemed more agile towards things like custom development which we feel could become important quite early-on. The contract with them is for two years, so I suppose in around 18 months it would be good to check back in and see where you guys are at.

Dkt. 13-20. This customer did not reference the Advertising Campaign.

Thibodeaux does not provide any additional testimony about specific lost customers. Instead, he declares, based on Skio's internal tracking, that it is aware of "at least ten existing Skio merchants who have raised post-acquisition concerns with Skio in terms that closely track" the concerns identified in the Advertising Campaign. Dkt. 13-5 ¶ 57. Members of Skio's sales teams, who have not submitted any testimony in support of the Motion, reportedly told Thibodeaux that "prospective Skio merchants in active sales discussions have raised Loop's statements" and have "asked Skio for assurances about the post-acquisition future of the platform." *Id.* ¶ 58.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

### 3.    Harm to Brand and Goodwill

Thibodeaux declares that, based on "years of investment in product, support, and customer relationships," Skio has developed a "brand and reputation in the Shopify merchant community" which is important to Skio's business. Dkt. 13-5 ¶ 60.

Based on his role at Skio, he declares that Skio's customers "communicate with one another about platform choices through online communities, public reviews of the Shopify App Store, and direct referrals among" competitors. *Id.* Thus, statements about a platform's "stability, support quality, and future viability move through these channels quickly and are difficult to correct once circulated." *Id.* Statements made in the Advertising Campaign, according to Thibodeaux, have already "begun to circulate" in these channels, which has caused "reputational harm" to Skio above and beyond the harm of lost revenue and lost customer relationships. *Id.* ¶ 61.

Similarly, Thibodeaux declares that Loop's claim -- that Skio merchants "have already started migrating" -- can become a self-fulfilling prophecy if not addressed. *Id.* ¶ 63. As he declares, "the longer [these] statements remain in circulation without correction, the more likely it is that some Skio merchants will act on those statements, and the more credibility Loop's future statements about a 'migration' will appear to have." *Id.*

These reputational harms, according to Thibodeaux, have affected the value of Recharge's acquisition of Skio, which depends on "Skio's continued ability to attract and retain merchants" using the Skio brand. *Id.* ¶ 65. Thibodeaux declares that the Advertising Campaign has "directly attack[ed]" the value of Recharge's $105 million acquisition by representing to Skio's existing and future customer base that Skio is in decline. *Id.* That has entailed harms to Recharge and Skio's "market position," a loss of "momentum during the post-acquisition transition" and a lost opportunity to "expand the Skio brand into adjacent segments" of the market. *Id.*

McArthur provides similar testimony about the harm caused by the Advertising Campaign to the acquisition value of Skio. Dkt. 13-1 ¶ 14. He also declares that the Advertising Campaign has harmed Recharge's reputation by representing that Recharge has an established "pattern" of pricing escalation, that Recharge's customer support is "slow and unresponsive," that Recharge is "the competitor most Skio brands were specifically trying to avoid," and that the "same pricing escalation and support patterns" that are "documented in 116 one-star reviews" have "gotten bigger" following the acquisition. *Id.* ¶ 15. McArthur declares that these allegedly false statements, which continue to circulate, have "damage[d] Recharge's reputation independent of any harm to" Skio's brand or services. *Id.*

### F.    Impact of the Requested Injunctive Relief

Jain declares that, if its advertising campaign were enjoined, "Loop would effectively be muzzled from competing in the marketplace" at a critical time, since "acquisitions often cause merchants to consider their options, and Loop needs to be able to discuss merchants' concerns about the long-term viability of Skio's platform now that it is no longer independent of Recharge." Dkt. 18-1 ¶ 25. According to Jain, if "Loop is unable to accurately compare its product and service with Plaintiffs', it will be challenging, if not impossible, for Loop salespeople to be able to talk to potential merchants and continue to grow the business." *Id.* ¶ 26.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

G.      The Parties' Interactions

Recharge, through its "Legal Team" based in Santa Monica, California,[10] sent Loop a cease-and-desist letter and follow-up email on May 8, 2026, demanding that Loop discontinue its allegedly false email marketing campaign, including the Emma Email and the Gupta Email. *See generally* Dkt. 13-3 ("May 8, 2026 Letter"); Dkt. 13-1 ¶ 8. In response, Jain declares that he "asked the Loop team to pause the email campaign" in an effort to "avoid litigation" and "put a stop to Recharge's endless bullying of Loop . . . ." Dkt. 18-1 ¶ 22.

In a telephone call between McArthur and Jain on May 8, 2026, McArthur declares that "Jain let [McArthur] know that he would stop Loop's false statements regarding Recharge and Skio and compete fairly moving forward." Dkt. 13-1 ¶ 8.[11] However, that same day, Loop allegedly sent the Slack Messages to Skio customers. *Id.* ¶ 10.

External litigation counsel for Recharge sent Loop a litigation hold letter on May 13, 2026. *See* Dkt. 13-4 ("May 13, 2026 Letter"). Despite that, McArthur declares that Loop continued to revise, but not retract, the Blog Post. Dkt. 13-1 ¶¶ 12–13. Based on Loop's failure to take corrective action, McArthur declares that he does "not expect Loop to discontinue its conduct without court-ordered relief." *Id.* ¶ 16.

There have also been prior business disputes between the parties. McArthur declares that, since at least August 2022, Recharge "has sent Loop multiple cease-and-desist letters and takedown demands documenting specific false statements" on Loop's website and in Loop's "direct outreach" to Recharge customers, including on August 24, 2022, November 15, 2022, January 31, 2023, August 15, 2023, October 31, 2024, April 28, 2025, and April 7, 2026. *Id.* ¶ 17. In each instance, he declares that "Loop has made some partial corrections . . . but its pattern of deceptive marketing has persisted." *Id.*

Defendant has submitted evidence contesting McArthur's testimony. Jain declares that, although each of Recharge's claims and demands were found "to be meritless" after an investigation, Loop has made "good faith adjustments to its advertising and comparison charts, in an effort to keep the competition amicable." Dkt. 18-1 ¶ 14. Further, Jain declares that, in the course of Loop's investigations, it determined that "Recharge employees were making false statements to merchants about Loop's product and service, and questioned Loop's long term viability because Loop was a smaller player than Recharge." *Id.* ¶ 16.

Finally, pursuant to a stipulation reached by the parties, Defendant agreed "to make no further outbound statements regarding the following topics until the hearing on [the Motion]: (1) statements that Skio's product will be sunset, killed, discontinued, or that merchants will be forced off Skio; (2) statements that Skio customers' pricing will increase as a result of Recharge's acquisition of Skio; and (3) statements that Skio's support quality will deteriorate as a result of Recharge's acquisition of

---

[10] The signatory of the May 8, 2026 Letter was Matthew Noren, who identified himself as "VP & General Counsel" of Recharge. Dkt. 13-3 at 5. Defendant has submitted evidence that Noren is not licensed to practice law in California, but is licensed to practice in Missouri, and that he resides in Lincoln, Nebraska. Dkt. 18 at 11 n.6. Defendant implies that Noren may be practicing law in California in violation of the California Rules of Professional Conduct, the California Rules of Court, and the California Business and Professions Code. *Id.* However, those issues are not material to those presented by the Motion.

[11] Jain declares that he never characterized Loop's "statements as false" in this telephone call. Dkt. 18-1 ¶ 23.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

Skio." Dkt. 20 at 2. The parties agree, however that Defendant may continue to make "promotional statements relating to the following topics: (1) the fact that Recharge acquired Skio, including publicly available details regarding the transaction; (2) factual comparisons between Loop, Recharge, and Skio pricing, where backed by contracts, public pricing, customer quotes, or other evidence; and (3) other topics relating to Recharge's acquisition of Skio that is unrelated to the restricted statements described above." *Id.* at 3. The parties also represent that Defendant has agreed to "instruct its salespeople" about these commitments. *Id.*

### III.     Evidentiary Objections

Each of the parties has submitted evidentiary objections in connection with the Motion. Dkt. 18 at 11–13; Dkt. 24. It is well-established, however, that the "Federal Rules of Evidence do not strictly apply to preliminary injunction" proceedings. *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), *aff'd*, 869 F.3d 848 (9th Cir. 2017); *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013). "While district courts may consider inadmissible evidence in the context of a preliminary injunction, this does not mean that evidentiary issues have no relevance to this proceeding. Such issues, however, properly go to weight rather than admissibility." *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 119 F. Supp. 3d 1177, 1185 (C.D. Cal. 2015).

Therefore, the parties' evidentiary objections are not independently addressed. Instead, well-founded objections raised by a party have been considered in determining the weight and credibility to be accorded to the evidence that has been proffered.

### IV.     Legal Standards

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In determining whether to grant such relief, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)). The moving party has the burden of persuasion. *See Hill v. McDonough*, 547 U.S. 573, 584 (2006). That burden is a "heavy" one. *Ctr. for Competitive Pol. v. Harris*, 784 F.3d 1307, 1312 (9th Cir. 2015), *abrogated on other grounds by Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021).

When resolving a motion for preliminary injunction, the district court acts as a finder of fact, weighing evidence and evaluating credibility when required. *See Puricle, Inc. v. Church & Dwight Co.*, 568 F. Supp. 2d 1144, 1147 (C.D. Cal. 2008) (collecting cases); *Porretti v. Dzurenda*, 11 F.4th 1037, 1051 (9th Cir. 2021) ("[D]istrict court[s] may render credibility determinations before deciding a motion for a preliminary injunction."). In evaluating whether a preliminary injunction is appropriate, "the findings of fact and conclusions of law made by a court . . . are not binding at trial on the merits." *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Nor are they binding in future pretrial proceedings in which the same or similar issues are presented based on additional evidence. *See Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007) ("[D]ecisions at the preliminary injunction phase do not constitute the law of the case.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

To obtain a preliminary injunction, the moving party must show the following: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of immediate or prompt relief; (3) the balance of equities tips in favor of the moving party; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.

The Ninth Circuit applies a "sliding scale" approach to the requirements necessary for interim injunctive relief. Accordingly, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Pimental v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). Likelihood of success on the merits is "the most important factor" in determining whether preliminary injunctive relief is warranted. *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). If the moving party fails to show a likelihood of success on the merits, the court "need not consider the remaining three [*Winter* elements]." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013)). Similarly, irreparable harm is a threshold requirement for preliminary injunctive relief. *See Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011) (without a showing of likely irreparable harm, the remaining factors need not be reached); *see also Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) ("[I]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." (quoting *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233–34 (2d Cir. 1999))).

Alternatively, where a plaintiff establishes "serious questions going to the merits," and demonstrates "a balance of hardships that tips sharply towards the plaintiff," a preliminary injunction may be warranted "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Cottrell*, 632 F.3d at 1135. *Cottrell* determined that this "serious questions" test,[12] which requires a lesser showing as to success on the merits than the "likelihood of success" test, continues to apply following *Winter* when two conditions are met. *First*, the balancing of the equities must tip "sharply" in favor of movant. *Id. Second*, the other *Winter* factors -- irreparable harm and the public interest -- must be established. See *Farris v. Seabrook*, 677 F.3d 858, 864–65 (9th Cir. 2012).

**V.      Analysis**

      A.      Likelihood of Success on the Merits

            1.      False Advertising Under § 43(a) of the Lanham Act

Any person who uses in commerce any "false or misleading representation of fact" in "commercial advertising or promotion" concerning the "nature, characteristics, qualities, or geographic origin" of "his or her or another person's goods, services, or commercial activities" is subject to liability under § 43(a) of the Lanham Act. 15 U.S.C. § 1125(a)(1)(B). A prima facie case for false advertising under Section 43(a) requires the following showing:

      (1) [T]he defendant made a false statement either about the plaintiff's or its own product;

---

[12] Although Plaintiffs cite *Cottrell*, Dkt. 13 at 15, they do not argue specifically that they have satisfied the *Cottrell* "serious questions" standard. Therefore, the *Winter* standard is applied in this Order.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

(2) the statement was made in commercial advertisement or promotion; (3) the statement actually deceived or had the tendency to deceive a substantial segment of its audience; (4) the deception is material; (5) the defendant caused its false statement to enter interstate commerce; and (6) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by a lessening of goodwill associated with the plaintiff's product.

*Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1052 (9th Cir. 2008) (quoting *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 n.4 (9th Cir. 2002)).

To establish § 43(a) liability, it must be shown that the defendant made a "false statement of fact," not simply that the defendant engaged in nonactionable puffery, which involves "exaggerat[ion], blustering, and boasting upon which no reasonable buyer would rely." *L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 860–61 (N.D. Cal. 2015) (quoting *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997)). The representation of fact must be literally false or misleading. "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms*, 108 F.3d at 1139.

"Literal falsity" is satisfied when the "claim conveyed by the advertisement" is "literally false." *InSinkErator, LLC v. Joneca Co., LLC*, 163 F.4th 608, 615 (9th Cir. 2025) (quoting *Clorox Co. P.R. v. Proctor & Gamble Co.*, 228 F.3d 24, 34 (1st Cir. 2000)).[13] "In analyzing whether an advertisement . . . is literally false, a court must determine, first, the unambiguous claims made by the advertisement . . ., and second, whether those claims are false." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (ambiguous statements cannot be literally false). The content of a claim contained in an advertisement is determined by its "full context." *Southland Sod Farms*, 108 F.3d at 1139.

When the advertisement contains an express falsehood, the literal falsity inquiry ends because the advertisement is literally false "on its face." *See id.*; *see also Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 382 (7th Cir. 2018) (a literal falsehood is "an explicit representation of fact that on its face conflicts with reality"). When an advertisement is not facially and explicitly false, however, it may still be "literally false" by "necessary implication" when considered in the full context in which the false claim is made, *i.e.*, the words and images of the advertisements and their likely reception by consumers. *InSinkErator*, 163 F.4th at 616; *Clorox*, 228 F.3d at 35. Thus, "[a] claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated," and such claim is false. *InSinkErator*, 163 F.4th at 616 (quoting *Clorox*, 228 F.3d at 35). Accordingly, "if the language or graphic," based on its full context, "is susceptible to more than one reasonable interpretation" -- one of which is false, the other of which is true – "the

---

[13] Literally true statements that are likely to confuse or mislead consumers are also actionable under Section 43(a) of the Lanham Act. *See Southland Sod Farms*, 108 F.3d at 1140; *Clorox*, 228 F.3d at 35 (ambiguous statements cannot be literally false, but may still be misleading); *see also Zeltiq Aesthetics, Inc. v. BTL Indus., Inc.*, 32 F. Supp. 3d 1088, 1100 (N.D. Cal. 2014) ("different evidentiary burdens" apply to literally false claims and literally true but misleading claims because the latter require extrinsic evidence of consumer confusion). However, Plaintiffs argue only that the statements at issue here are literally false. Accordingly, whether they are literally true but still misleading is not addressed in this Order.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

advertisement cannot be literally false." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007); *see also Clorox*, 228 F.3d at 35 ("[A] factfinder might conclude that the message conveyed by a particular advertisement remains so balanced between several plausible meanings that the claim made by the advertisement is too uncertain to serve as the basis of a literal falsity claim, though . . . it could still form the basis for a claim that the advertisement is misleading."). Thus, when the claims of an advertisement are "implicit, attenuated, or merely suggestive," the advertisement might be misleading, but it "cannot fairly be characterized as literally false" -- whether explicitly or by necessary implication. *See United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1181 (8th Cir. 1998).

Plaintiffs contend that the Advertising Campaign includes three categories of literally false claims. They are separately discussed in the following subsections.

> a)      Sunsetting Claims

Plaintiffs contend that Defendant has falsely claimed that "Skio will cease to operate on a standalone basis after the acquisition, leaving merchants with a binary choice between Recharge and Loop," and that this is literally false under § 43(a). Dkt. 13 at 16–17. Plaintiffs identify what they contend are four literally false claims ("Sunsetting Claims"): (1) the original Blog Post, which stated that, post-acquisition "smaller platforms historically 'get[] sunset'"; (2) the Acquisition Banner, which stated: "Your choice just got simpler: Loop or Recharge"; (3) the May 16, 2026 iteration of the Blog Post, which stated: "If you're evaluating platforms for the first time: the decision just got simpler. It's Loop or Recharge"; and (4) direct messages to customers that stated that customers are "Back to square one for [their] platform future." *Id.*

Plaintiffs have not shown a likelihood of success under § 43(a) on the merits with respect to any of the Sunsetting Claims. *First*, § 43(a) only applies to false statements that concern the "nature, characteristics, qualities, or geographic origin" of the plaintiff or defendant's goods, services, or commercial activities. 15 U.S.C. § 1125(a)(1)(B). The Ninth Circuit has held that "the nature, characteristics, and qualities of [a product] under the Lanham Act are more properly construed to mean *characteristics of the good itself* . . . ." *Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137, 1144 (9th Cir. 2008). *Sybersound Recordings* rejected the contention that false claims about the licensing status of a song could give rise to a § 43(a) claim because licensing status, as opposed to the content of the song and its inherent qualities, was not a "quality" or "characteristic" inherent to the good. *Id.* The Ninth Circuit has continued to apply *Sybersound Recordings*. *See, e.g.*, *Vericool World, LLC v. Igloo Prods. Corp.*, 175 F.4th 1045, 1058–59 (9th Cir. 2026) (false claim about the date on which a product was first marketed was not actionable under § 43(a) in part because it is not "inherently a claim about the tangible characteristics of the [product] itself"). Further, "[s]ome district courts have relied on [*Sybersound Recordings*] to impose this inherent to the product limitation." *Memjet Tech. Ltd. v. Vanguard Graphics Int'l, LLC*, No. 23-CV-1810, 2025 WL 976915, at *6 (S.D. Cal. Apr. 1, 2025) (collecting cases); *see also Time Warner Cable*, 497 F.3d at 153 n.3 ("Under either theory, the plaintiff must also demonstrate that the false or misleading representation involved an inherent or material quality of the product.").

Under *Sybersound Recordings*, *Vericool World*, and district court decisions that have interpreted and applied similar principles, the Sunsetting Claims do not refer to any inherent quality or characteristic of the services offered by Plaintiffs or Defendant. *See Memjet Tech.*, 2025 WL 976915, at *6 (a claim that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

competitor's product was "being discontinued" was not actionable because it did not refer to an inherent characteristic or quality of the goods at issue); *Williams-Sonoma, Inc. v. Wayfair Inc.*, 652 F. Supp. 3d 216, 224 (D. Mass. 2023) (a claim that a product was "exclusively" available from the defendant, when it was also offered by the plaintiff, was not actionable because it did not "relate to the properties, capabilities, or characteristics" of the goods); *Nexus Pharms., LLC v. Long Grove Pharms., LLC*, No. 24-CV-10444, 2025 WL 81877, at *5 (D. Mass. Jan. 13, 2025) (a claim that a product was in short supply, when it was not, was not actionable because "statements regarding supply and demand phenomena" do not relate to inherent characteristics or qualities of goods); *Maximum Availability Ltd. v. Vision Sols., Inc.*, No. 10-CV-1488, 2011 WL 13176820, at *6 (C.D. Cal. Dec. 12, 2011) (a claim that a number of customers of plaintiff had switched to defendant did not concern the "nature, characteristics, qualities, or geographic origin" of the plaintiff's goods or services). Rather, the Sunsetting Claims only refer to market structure and competitive dynamics in the industry, which are analogous to the "supply and demand phenomena" that courts have found do not state a claim under § 43(a). *Nexus Pharms.*, 2025 WL 81877, at *5. For these reasons, Plaintiffs have not presently shown a likelihood of success in demonstrating that the Sunsetting Claims are actionable false statements of fact under § 43(a).

*Second*, even if the Sunsetting Claims were actionable in principle, none of them has been shown to be literally false. The first Sunsetting Claim, from the original Blog Post, taken in its full context, states that "*historically* . . . when a platform gets acquired by its largest competitor," the smaller platform "gets sunset or rolled into the acquirer's product." Dkt. 13-8 at 3. The Blog Post also states, truthfully, that, Plaintiffs' "official position" is that "[n]othing" will "change[] immediately." *Id.* Thus, this Claim is *literally* about "historical[]" industry trends. There is no evidence that these statements are literally false on their face. For example, Plaintiffs have not presently proffered evidence that smaller platforms are *not* historically phased out following their acquisition by a larger, established brand as a matter of industry trends. Nor have Plaintiffs pointed to any statement in the Sunsetting Claims that misrepresents Plaintiffs' announced intentions with respect to sunsetting Skio. Instead, the original Blog Post accurately reproduces Plaintiffs' "official position."

There is also no present showing that the original Blog Post is literally false by necessary implication. At most, it could be read to imply that there is a *risk* that Skio will be sunset in the future based on industry trends. However, that is a prediction about future events, which is not an actionable statement of fact as a matter of law. "[C]ourts have consistently held that '[p]redictions of future events are . . . nonactionable expressions of opinion' under the Lanham Act." *Registered Agent Sols., Inc. v. Corp. Serv. Co.*, No. 21-CV-786, 2022 WL 911253, at *5 (D. Del. Mar. 28, 2022) (quoting *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 235 (5th Cir. 2014)); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) (statements of opinion are not actionable because they are "not a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact").

That Plaintiffs have published advertisements that purportedly commit to maintaining Skio through 2028 does not establish on the present record that there is *no* risk that Skio will be sunset. Indeed, Thibodeaux's own public-facing statements recognize that there is some uncertainty about the future of Skio. Dkt. 13-7 at 2 ("[F]rankly, we don't know what skio or recharge or (maybe even) some new platform is gonna look like in a year and a half"). Plaintiffs' statements -- even if read favorably to them and with the recognition that their declarants have testified that Plaintiffs intend to honor their nonbinding public commitments -- convey only that Skio is "unlikely to" be sunset through 2028, which

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

is not contradicted by any express or necessarily implied claim asserted in the Blog Post. *See Registered Agent Sols.*, 2022 WL 911253, at *5 (advertisement that competitor was "going out of business soon" was not a literally false statement of fact because it was a future prediction; even if the competitor set forth evidence of its stable finances and concrete plans for growth, that would not prove the falsity of the claim, but would only show that the claim was not likely to be true); *Glob. Tech Led, LLC v. Hilumz Int'l Corp.*, No. 15-CV-553, 2017 WL 588669, at *6 (M.D. Fla. Feb. 14, 2017) (claim that a competitor is "going out of business" is a "non-verifiable prediction or opinion about the future" and is "not actionable . . . under the Lanham Act" (quoting *Medison Am., Inc. v. Preferred Med. Sys., LLC*, 548 F. Supp. 2d 567, 579 (W.D. Tenn. 2007), *aff'd*, 357 F. App'x 656 (6th Cir. 2009))).

To support the proposition that Defendant's statements are actionable literal falsehoods, not simply predictions, Plaintiffs quote the following language from *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 931 (9th Cir. 2010): "An honest or sincere statement of belief about a future event is not actionable, but a statement known at the time by the speaker to be false, or a statement by a speaker who lacks a good faith belief in the truth of the statement, may constitute an actionable misrepresentation." Dkt. 23 at 9. That statement was made in the context of a discussion of fraud, under California common law, rather than the Lanham Act. *PhotoMedex*, 601 F.3d at 931. As part of that discussion, *PhotoMedex* cited two cases -- each of which involved common law fraud. *Id.* (first citing *Richard P. v. Vista Del Mar Child Care Serv.*, 106 Cal. App. 3d 860, 865 (1980); and then citing *Harris v. United States*, 48 F.2d 771, 781 (9th Cir. 1931)). Moreover, there is no present evidence that Defendant knew that its statements about the long-run trajectory of Skio were false, or that it made those statements in bad faith.

For the remaining three Sunsetting Claims -- "Your choice just got simpler: Loop or Recharge," "If you're evaluating platforms for the first time: the decision just got simpler. It's Loop or Recharge," and "Back to square one for your platform future" – Plaintiffs contend that they present consumers with a false "binary choice between Recharge and Loop." Dkt. 13 at 16. That binary is literally false, according to Plaintiffs, because Skio remains a viable third option based on Plaintiffs' public statements. *Id.* at 16–17. This argument fails because these claims are ambiguous in multiple respects. *See In re Century 21-RE/MAX Real Estate Adver. Claims Litig.*, 882 F. Supp. 915, 923 (C.D. Cal. 1994) (ambiguous claims cannot be literally false).

One reasonable interpretation of these claims is that customers now have two choices with respect to independent *service providers* in the marketplace: Loop or Recharge. Based on the present record, that proposition could be deemed literally true because the third choice, Skio, has now been acquired by Recharge and is not a separate and distinct competitive entity. *See Mt. Hood Stages, Inc. v. Greyhound Corp.*, 555 F.2d 687, 694 (9th Cir. 1977) ("Acquisition of control of one company by another necessarily contemplates exercise by the parent of control over the internal business operations of the subsidiary."), *vacated*, 437 U.S. 322 (1978); *cf. Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) (establishing the black-letter principle that a parent corporation and its subsidiary entities are a single entity, and therefore are not legally capable of conspiring in violation of the antitrust laws). Indeed, Plaintiffs' own announcement describes Skio as a "Recharge company" and states that "Skio is joining Recharge." Dkt. 13-6 at 2. Although these three claims may also be interpreted as a reference to customers' choices among *apps*, rather than service providers, that is not the only reasonable interpretation of the claim. Therefore, based on the current record, the remaining three

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

Sunsetting Claims have not been shown to be literally false because they are literally true under one reasonable interpretation of the claim in context. *Time Warner Cable*, 497 F.3d at 158.[14]

Even assuming that the Sunsetting Claims unambiguously refer to a binary among "apps" instead of independent service providers, Plaintiffs still have not presently shown that the binary presented by the Sunsetting Claims expressly or by necessary implication conveys a false statement. Although Skio exists as an independent brand today, the Sunsetting Claims do not expressly contradict that fact by stating that a consumer's *current* choice is binary. Rather, they state only that consumers' "choice" or "decision" is between Loop and Recharge. If "choice" and "decision," read in context, can reasonably refer only to a consumer's immediate options based on current market conditions, the Sunsetting Claims might arguably be literally false statements of fact. However, in context, and in light of the present record, it is reasonable to give these claims a more expansive meaning. *See Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir. 2009) (in some cases, the "alleged literal falsehood must be considered in context and with reference to the audience to which the statement is addressed"); *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, No. 12-CV-3762, 2014 WL 572290, at *5 (N.D. Cal. Feb. 11, 2014) (in the literal falsity inquiry, courts may consider whether "the statements were made to sophisticated consumers with unique background knowledge and experience" as part of the context of the statement).

Because consumers typically contract with service providers for longer periods, the competitive "choice" and "decision" addressed in the Sunsetting Claims can reasonably be construed to refer to long-term market structure and competitive dynamics, rather than current conditions. *See* Dkt. 13-5 ¶ 52 (average Skio customer uses Skio's services for approximately 20 months). Indeed, Thibodeaux himself states that customers are seeking a "platform to support their subscription business for the long term." *Id.* ¶ 62. Consistent with that, many of the challenged advertisements frame customer choice in terms of long-run impact, rather than immediate market conditions. *See, e.g.*, Dkt. 13-13 at 2 ("[S]ubscriptions aren't a 12 or 18-month business. . . . The question that matters for a brand evaluating a subscription platform isn't only 'what happens next quarter' - it's 'what does my subscription infrastructure look like across the lifetime of the customers I'm acquiring on it. That's where the post-2028 picture matters."); Dkt. 13-14 at 2 (same); Dkt. 13-15 at 2 (same). Thus, the remaining Sunsetting Claims can reasonably be interpreted under the current record as stating that a customer's long-run choice is between Loop and Recharge and that the acquisition may require reconsideration of long-term platform choices at "square one." This claim is not literally false because even Plaintiffs have not committed to maintain Skio as a long-term option for consumers beyond 2028.

Finally, even if the claims are construed as referring to customers' short-run "choices" and "decisions," *i.e.*, Skio's future through 2028, the current record does not show that they are literally false. Thus, they can be reasonably understood to be predictions that Plaintiffs' commitment to maintain Skio through 2028 may not be honored, and that there is a risk that Skio will be sunset earlier. These are not

---

[14] In their reply, Plaintiffs also contend that these Claims are literally false because there are other competitors in the market, including Stay AI, Recurly, and Smartrr. Dkt. 23 at 10. This argument was not raised initially in support of the Motion. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). Even if it were considered on its merits, it is unpersuasive because the current record reflects that the primary market participants are Recharge, Skio, and Loop. Although there might be smaller market participants, that does not make the Sunsetting Claims literally false because they can be reasonably construed as referring to the options that consumers have among major providers.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

statements of fact capable of being proven true or false. *See Coastal Abstract Serv.*, 173 F.3d at 731 (statements of opinion are not actionable because they are "not a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact"). Further, Plaintiffs have not proffered evidence that they are obligated to maintain Skio as an independent brand through 2028, *e.g.*, through contracts with individual customers or as a term of the acquisition agreement. As Thibodeaux has acknowledged in public communications, there is continuing uncertainty about the future of Skio. Dkt. 13-7 at 2 ("[F]rankly, we don't know what skio or recharge or (maybe even) some new platform is gonna look like in a year and a half").

For these reasons, the only "necessary" implication of the claims -- that Plaintiffs may not honor their nonbinding commitment to maintain Skio through 2028 and that Skio's future remains uncertain beyond that point in time -- is not a matter of verifiable fact, but rather, an opinion or prediction about future events. *See Registered Agent Sols.*, 2022 WL 911253, at *5 (advertisement that competitor was "going out of business soon" was not a literally false statement of fact because it was a future prediction); *Glob. Tech Led*, 2017 WL 588669, at *6 (claim that a competitor is "going out of business" is a "non-verifiable prediction or opinion about the future" and is "not actionable . . . under the Lanham Act" (quoting *Medison Am.*, 548 F. Supp. 2d at 579)). Accordingly, these claims are appropriately deemed predictive opinions that are not capable of being proven true or false. *See Coastal Abstract Serv.*, 173 F.3d at 731.

Because Plaintiffs have not presently shown that the Sunsetting Claims are literally false, they have not shown a likelihood of success on the merits of their corresponding § 43(a) cause of action.[15]

b)      Pricing Claims and Support Claims

Plaintiffs next contend that Defendant has "falsely claim[ed] that Skio will raise prices" ("Pricing Claims") and falsely claimed that Skio's "customer support will worsen" ("Support Claims"). Dkt. 13 at 17. Plaintiffs identify what they contend are three literally false claims: (1) the Gupta Email, which stated that "renegotiation usually shows up faster than you'd think" and the "CSM you've built rapport with might get reassigned"; (2) the Slack Messages, which stated that "[n]egotiated pricing gets renegotiated" and "CSMs get[] reshuffled eventually"; and (3) the original Blog Post, which posed the hypothetical question: "Will the small, responsive support team that Skio reviewers praised remain intact — or get absorbed into Recharge's support infrastructure, which its own reviewers have documented as slow and unresponsive?" *Id.*

Based on the current record, Plaintiffs have not shown that the Pricing Claims and Support Claims are literally false. The Gupta Email and the Slack Messages warn consumers that pricing or support may change after an acquisition based on historical trends, but do not affirmatively and expressly assert that Skio's pricing or support will change. Each advertisement, read in its full context, includes specific

---

[15] For the same reason, Plaintiffs have not shown that the Sunsetting Claims were actually deceptive, which is a separate element required to establish a § 43(a) claim. Although literally false statements give rise to a presumption of consumer deception and reliance, those elements of a § 43(a) claim must be proven, with evidence, if the statements at issue are literally true but allegedly misleading. *See Avid Identification Sys., Inc. v. Schering-Plough Corp.*, 33 F. App'x 854, 856 (9th Cir. 2002); *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

qualifiers. Dkt. 13-9 at 2 (after discussing possible changes, stating: "Not saying any of this is happening tomorrow. Just worth keeping an eye on."); Dkt. 13-11 at 2 (after discussing possible changes, stating: "Not sure if all or even anything would happen with you but this is what *generally* happens." (emphasis added)).

The same is true for the original Blog Post. That advertisement truthfully conveyed Recharge's "official position" that Skio would be maintained, but then described what "historically happens" post-acquisition. Dkt. 13-8 at 3. The original Blog Post, in its full context, referred to the possibility of service changes as an open "question[] nobody has answers to yet" and a point of "uncertainty" about future changes. *Id.* Thus, the Pricing Claims and Support Claims, taken in their full context, are about industry trends. As with the Sunsetting Claims, Plaintiffs have proffered no evidence that these statements are literally false representations. Nor have Plaintiffs pointed to any statement that misrepresents Plaintiffs' announced intentions with respect to Skio's pricing or service quality.

Again, as with the Sunsetting Claims, Plaintiffs have not shown that the Pricing Claims and Support Claims are false by necessary implication based on the current record. They can be read to imply the claim that there is a *risk* that Skio's prices may increase or that its service quality may decline at some indeterminate future point, based on industry trends. However, that is an opinion or prediction about future events, not an actionable statement of fact. *See Registered Agent Sols.*, 2022 WL 911253, at *5; *Glob. Tech Led*, 2017 WL 588669, at *6. That Plaintiffs have promised to honor their commitment to maintain Skio's price and service quality through 2028 implies that Skio is "unlikely to" raise prices or reduce service quality through 2028. *Registered Agent Sols.*, 2022 WL 911253, at *5. But that does not contradict any necessary inference drawn from the Pricing Claims and Support Claims. *Id.* (advertisement that competitor was "going out of business soon" was not a literally false statement of fact because it was a future prediction; even if the competitor set forth evidence of its stable finances and concrete plans for growth, that would not prove the falsity of the claim, but would only show that the claim was not likely to be true). Again, Thibodeaux's public statements recognize that the future of Skio is an uncertain matter. *See* Dkt. 13-7 at 2 ("[F]rankly, we don't know what skio or recharge or (maybe even) some new platform is gonna look like in a year and a half").

Because Plaintiffs have not presently shown that the Pricing Claims or Support Claims are literally false, they have not shown a likelihood of success on the merits of their corresponding § 43(a) cause of action.[16]

c)      Comparison Table

Plaintiffs next contend that the Comparison Table falsely claims that Skio lacks certain features. Dkt. 13 at 17–18. Because Skio has these features, Plaintiffs contend that the Comparison Table is "literally false because" it states that "Skio lacks features that it offers." *Id.* at 18.

The Comparison Table includes a literally false statement of fact actionable under § 43(a) because Defendant concedes that the Password Claims were literally false. *See* Dkt. 18 at 22.[17]  Defendant's

---

[16] As with the Sunsetting Claims, Plaintiffs have also not presently shown that these Claims were actually deceptive, which is a separate element required to establish a § 43(a) claim.

[17] There is insufficient evidence to determine that the remaining information contained in the Comparison Table is literally false. Thibodeaux has claimed that the information contained in the Comparison Table is false because it

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

response -- that the Password Claims were merely "inadvertent error[s]," *id.* -- is unpersuasive because § 43(a) is a strict liability cause of action. *Vector Prods., Inc. v. Hartford Fire Ins. Co.*, 397 F.3d 1316, 1319 (11th Cir. 2005); *Philip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073–74 (C.D. Cal. 2004). It also does not matter that Defendant truthfully described Skio's features elsewhere on its website (*i.e.*, outside of the context of this particular advertisement) because the Comparison Table itself still contains literally false claims of fact, which Defendant does not dispute. Dkt. 18 at 19 n.8.

Plaintiffs' § 43(a) claim is still unlikely to succeed, however, because Plaintiffs have not presently produced sufficient evidence that any claim in the Comparison Table is material. Unlike the deception element of § 43(a), a literally false statement does not carry a presumption of materiality. *See Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003); *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1111 (9th Cir. 2012); *Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, No. 20-55933, 2021 WL 4622504, at *1 (9th Cir. Oct. 7, 2021); *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 310 F. Supp. 3d 1089, 1125 (S.D. Cal. 2018) (discussing Ninth Circuit precedent); *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 644 n.6 (N.D. Cal. 2019). Thus, Plaintiffs must present evidence that the claims in the Comparison Table are "likely to influence the purchasing decision" in the relevant market. *Skydive Ariz.*, 673 F.3d at 1110.

Plaintiffs have not proffered any probative evidence that claims in the Comparison Table are likely to influence the purchasing decision of customers in the relevant market. *See InSinkErator*, 163 F.4th at 619–20 (circumstantial evidence, as well as direct consumer evidence, can prove materiality). Plaintiffs present no survey evidence, which is the "typical[]" means to prove materiality. *See Skydive Ariz.*, 673 F.3d at 1110 (quoting *Southland Sod Farms*, 108 F.3d at 1140). Nor do Plaintiffs present any direct evidence from consumers themselves that the features highlighted in the Comparison Table were ones about which they cared when making decisions. *See id.* at 1111 (affirming grant of summary judgment where consumer declarations provided direct proof of materiality).

The only evidence presented by Plaintiffs consists of conclusory statements by Thibodeaux that consumers care about "product features," without any mention of the particular features at issue here. Dkt. 13-5 ¶ 47. This evidence has limited weight as to establishing whether the particular claims in the Comparison Table are likely to influence customers. *See Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, No. 17-CV-1613, 2017 WL 10399343, at *3 (C.D. Cal. Nov. 17, 2017) (expert evidence that merely "speculate[d] what a hypothetical consumer would do" was not sufficient to prove materiality); *see also See A.C.L.U. of Nev. v. City of Las Vegas*, 13 F. Supp. 2d 1064, 1071 (D. Nev. 1998) ("[C]ourts should be wary of granting a preliminary injunction based solely on allegations and conclusory affidavits submitted by plaintiff."). Although circumstantial evidence of materiality may be considered, Thibodeaux's testimony is conclusory and warrants minimal weight. *Cf. InSinkErator*, 163 F.4th at 619–20 (affirming a finding that a garbage disposal's horsepower was material based on market research, retailer behavior suggesting that consumers cared about horsepower, and because horsepower inherently affected the function of a garbage disposal).

---

states that Skio lacks certain features that Skio actually has. Dkt. 13-5 ¶ 35. Agarwal has submitted detailed evidence explaining why the Comparison Table is literally true other than as to the false Password Claims. Dkt. 18-2 ¶¶ 9–16. Because Plaintiffs have not presently rebutted Agarwal's testimony, Plaintiffs have not shown a likelihood of success in establishing that the Comparison Table is literally false other than as to the Password Claims.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

Moreover, there is presently insufficient evidence that the Comparison Table is material as a matter of fact. "[N]umerous courts have found an absence of materiality in Lanham Act false-advertising cases when the target audience consisted of sophisticated individuals who were unlikely to be swayed by promotional materials." *G. W. Aru, LLC v. W. R. Grace & Co.-Conn.*, 803 F. Supp. 3d 346, 400–01 (D. Md. 2025) (collecting cases); *see* also 4 J. Thomas McCarthy on Trademarks and Unfair Competition § 27:35, Westlaw (5th ed.) (database updated June 2026) ("Where an expensive product is sold by personal contacts, misleading claims in a sales brochure may not have a tendency to deceive or influence purchasing decisions and hence not be a violation of § 43(a)."); *cf. AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979) (in trademark context, confusion is less likely "[w]hen goods are expensive" and "buyer[s] can be expected to exercise greater care in [their] purchases"). The record reflects that the customers in this market are "business owners, not average consumers." Dkt. 18-1 ¶ 6. The purchasing decision here involves long-term commitments with significant business consequences, which entails that purchasing decisions are likely made after extensive research and reflection, rather than on the basis of advertising statements. Dkt. 13-5 ¶ 52 (Thibodeaux declaring that average Skio customer uses Skio's services for approximately 20 months); *id.* ¶ 62 (Thibodeaux declaring that merchants migrate with an expect[ation] that "the destination platform [will] support their subscription business for the long term"); Dkt. 18-1 ¶ 6 (Jain declaring that purchasing decision depends on technical integration, long term support, and pricing). The services at issue are also offered at a high price. Dkt. 13-8 at 4.

Based on these customer and market characteristics, weight is accorded to Jain's testimony that the relevant customers are sophisticated; they are "unlikely to make decisions quickly" based on advertising because merchants typically "engage in thorough research regarding" purchasing decisions, which can "take weeks or months of back-and-forth negotiation." Dkt. 18-1 ¶¶ 6–7; *see also* Dkt. 13-5 ¶ 56 (Thibodeaux declaring that one potential customer considered Skio by "reviewing proposals, pricing, and demos" over a month-long period before ultimately declining to migrate to Skio). Plaintiffs have proffered no evidence to counter the inference that the relevant customers in the subscription-management market are sophisticated.

Because the record reflects that the parties' customers are sophisticated -- in that they conduct independent and extensive evaluations of competing services prior to a purchasing decision, and are unlikely to be influenced by one-off online advertisements like the Comparison Table -- Plaintiffs have not presently shown a likelihood of success in demonstrating that the Comparison Table is material. The only case cited by Plaintiffs, *Homeland Housewares, LLC v. Euro-Pro Operating LLC*, No. 14-CV-3954, 2014 WL 4187982 (C.D. Cal. Aug. 22, 2014), is distinguishable on this basis. Dkt. 13 at 18–19; Dkt. 23 at 10. There, unlike here, the customers at issue were unsophisticated retail purchasers of affordable blenders priced under $130; given those customer characteristics, it could be reasonably inferred that customers would rely on the defendant's false comparison, which was posted on the packaging of the blenders, without additional research. *See Homeland Housewares*, 2014 WL 4187982, at *3–4 (concluding that some consumers would likely "trust[]" the defendant's false comparison with the plaintiff's product and "may never undertake their own comparison"). By contrast, the record here implies that the relevant customers are sophisticated and are therefore not likely to be influenced by advertising like the Comparison Table. Indeed, Agarwal has declared that he is "not aware of any merchant specifically referencing or relying" upon the Comparison Table in making a purchasing decision or a merchant asking any questions about the Comparison Table. Dkt. 18-2 ¶ 7.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

Because Plaintiffs have not presently shown that any false claim in the Comparison Table is likely to be material, they have not shown a likelihood of success on the merits of their corresponding § 43(a) cause of action.

*          *          *

For those reasons, Plaintiffs have not presently demonstrated a likelihood of success on the merits of their Lanham Act § 43(a) claim.

> ### 2.     <u>UCL and FAL</u>

Plaintiffs' sole argument is that they are "likely to succeed on the merits" of their UCL and FAL claims "for the same reasons they are likely to succeed on the merits of their Lanham Act claims." Dkt. 13 at 20–21; *see also* Dkt. 23 at 12. For the reasons already discussed, Plaintiffs have not done so. Nor have Plaintiffs presented any argument in support of their UCL and FAL claims independent of the § 43(a) claim. For that reason, Plaintiffs have not demonstrated a likelihood of success on the merits of their UCL and FAL claims. *See Sybersound*, 517 F.3d at 1153 (dismissing UCL claim because the plaintiff could not state a claim under the Lanham Act).

> ### 3.     <u>Trade Libel</u>

Under California law, "trade libel is an intentional disparagement of the quality of property, which results in pecuniary damage." *Films of Distinction, Inc. v. Allegro Film Prods., Inc.*, 12 F. Supp. 2d 1068, 1081 (C.D. Cal. 1998) (quoting 5 B.E. Witkin, Summary of California Law, Torts § 573 (9th ed. 1988)); *see also Hartford Cas. Ins. Co. v. Swift Distrib., Inc.*, 59 Cal. 4th 277, 289–90 (2014). To state a claim for trade libel, a plaintiff "must show (1) a statement that (2) was false, (3) disparaging, (4) published to others in writing, (5) induced others not to deal with it, and (6) caused special damages." *TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 679 F. Supp. 2d 1120, 1140 (C.D. Cal. 2009). A plaintiff also must show that the statement was made with the knowledge of its falsity or "in reckless disregard of its truth or falsity." *Hartford Cas. Ins.*, 59 Cal. 4th at 290 (quoting Restatement (Second) of Torts § 623A (A.L.I. 1977)). While a cause of action for trade libel "'resembles that for defamation . . . [it] differs from it materially in the greater burden of proof resting on the plaintiff, and the necessity for special damage in all cases. . . . [T]he plaintiff must prove in all cases that the publication has played a material and substantial part in inducing others not to deal with him, and that as a result he has suffered special damages.'" *Muddy Waters, LLC v. Superior Court*, 62 Cal. App. 5th 905, 925 (2021) (quoting *Erlich v. Etner*, 224 Cal. App. 2d 69, 73 (1964)). The standard for special damages is "rigorous." *Erlich*, 224 Cal. App. 2d at 73. In evaluating trade libel, the California Supreme Court has warned that construing the elements for trade libel too broadly would result in "'vexatious lawsuits' over perceived slights" between competitors. *See Hartford Cas. Ins.*, 59 Cal. 4th at 294 (quoting *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1044 (1986)).

Plaintiffs have not shown a likelihood of success on their trade libel claim. As noted, with the exception of the Password Claims, the other claims have not been shown to be literally false. Rather, they were about industry trends or, at most, opinions or predictions that are not "provably false." *J-M Mfg. Co. v. Phillips & Cohen LLP*, 247 Cal. App. 4th 87, 100 (2016). "[M]ere opinions are not actionable" under California law "unless the published statement declares or implies a provably false assertion of fact." *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

The cases cited by Plaintiffs, Dkt. 13 at 21–22, involved literally false statements. *ADT Servs. AG v. Hilwey*, No. 10-CV-1812, 2010 WL 11684834, at *2–3 (S.D. Cal. Nov. 8, 2010) (statements that the plaintiff had been "bought out" and acquirer would handle plaintiff's support services were literally false because the plaintiff had not been "bought out," and could be construed as derogatory because they implied the plaintiff's "need for . . . assistance in running its business"); *Am. Bullion, Inc. v. Regal Assets, LLC*, No. 14-CV-1873, 2014 WL 3516252, at *3 (C.D. Cal. July 15, 2014) (trade libel claim had been adequately alleged where the statements at issue were false and unambiguously referred to the plaintiff, accusing plaintiff of running a "scam" and "Ponzi scheme" and claiming that its owner had been convicted for fraud).

Although the Password Claims are literally false, Plaintiffs have not presently proffered sufficient evidence that they caused special damages. To prevail on their trade libel claim, Plaintiffs must "identify *particular* customers and transactions of which it was deprived *as a result* of the libel." *Mann v. Quality Old Time Service, Inc.*, 120 Cal. App. 4th 90, 109 (2004) (emphasis added); *see also AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1154–55 (N.D. Cal. 2019) (plaintiff must identify particular customers associated with lost sales). The only evidence on which Plaintiffs rely for these elements is Thibodeaux's statements that Plaintiffs have lost customers as a result of Defendant's conduct. Dkt. 13-5 ¶¶ 46–59. This is insufficient to show a likelihood of success for three reasons.

*First*, Thibodeaux's testimony is internally inconsistent on a central issue -- whether customers have been diverted to Loop. Therefore, it warrants limited weight. In his declaration regarding the Emma Email, which stated that Skio customers have "already started migrating" to Loop, Thibodeaux stated: "To my knowledge, there is no ongoing migration of Skio merchants to Loop." Dkt. 13-5 ¶ 31. Thus, Thibodeaux initially declares that Skio merchants have not been lost to Loop to show that the Emma Email is false, and then states that Skio merchants have been lost to Loop in support of claimed special damages. *See* Dkt. 13-5 ¶ 53 ("In the weeks since the launch of Loop's false advertising campaign, Skio has already identified lost prospective and current customers to Loop, resulting in the loss of hundreds of thousands of dollars in annual revenue."). Such inconsistent testimony by the same witness warrants little, if any, weight. *See Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 449 (6th Cir. 2017) ("Courts have repeatedly held that a plaintiff's internally contradictory deposition testimony cannot, by itself, create a genuine dispute of material fact."). Plaintiffs contend that this internal inconsistency was "pluck[ed] out of context" by Defendant, Dkt. 23 at 11, but that is not shown by a consideration of the entirety of his testimony.

*Second*, even if Thibodeaux's testimony warranted weight on the issue of causation and special damages, it would still not be sufficient with respect to establishing a likelihood of success. Thus, there is no evidence that any specific customers were even exposed to the Comparison Table or the Password Claims, or that Plaintiffs lost customers or transactions due to the Password Claims, as opposed to other factors, including the positive features of Defendant's competing product. The evidence is, therefore, not sufficient to show a likelihood of success that Plaintiffs have suffered special damages that were caused by Defendant's alleged libel. *See RingCentral, Inc. v. Nextiva, Inc.*, No. 19-CV-2626, 2021 WL 2476879, at *7 (N.D. Cal. June 17, 2021) (special damages must be "proximately caused" by libelous statements); *Sundance Image Tech., Inc. v. Cone Editions Press*, Ltd., No. 02-CV-2258, 2007 WL 935703, at *10 (S.D. Cal. Mar. 7, 2007) (triable issue on causation where customers submitted testimony that they saw the libelous statements at issue, which caused them "hesitat[ion]" in doing further business with the plaintiff). Thibodeaux has identified two specific merchants, but has not

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

shown a causal link between losses related to these merchants and the Password Claims in particular or the Comparison Table in general. Indeed, the proffered evidence is that these merchants were concerned about the acquisition of Skio by Recharge. Dkt. 13-5 ¶ 49 (merchant expressed concern about future longevity of Skio as an independent platform post-acquisition after receiving the Emma Email); *id.* ¶ 56 (prospective merchant declined to contract with Skio after learning of the acquisition). There is no evidence that these merchants referred to the Comparison Table or the Password Claims, which are advertisements that predated and were not tied to the acquisition. *See Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 981 (N.D. Cal. 2013) (dismissing trade libel claim where "it is not even clear if this allegation [of lost sales] is connected to [the libel]"); *AlterG*, 388 F. Supp. 3d at 1154–55 (dismissing trade libel claim where the plaintiff had not "explained whether [customers'] decision . . . was attributable to [d]efendant's libel"). Further, there is evidence that the Comparison Table "received minimal traffic" during the 11 months that it was available, and Agarwal is unaware of "any merchant specifically referencing or relying" upon the Comparison Table in making a purchasing decision or a merchant asking any questions about the Comparison Table. Dkt. 18-2 ¶ 7.

*Finally*, Thibodeaux does not specifically identify any other "particular" lost customers or transactions with a sufficient causal nexus to the Password Claims. *Piping Rock Partners*, 946 F. Supp. 2d at 981 (rejecting "vague assertion" that unspecified clients had been lost); *AlterG*, 388 F. Supp. 3d at 1154–55 (dismissing trade libel claim because the plaintiff had "not identified any particular customers associated" with alleged lost sales). Thibodeaux's vague testimony about other groups of unspecified customers whose business has been lost or is at risk of being lost is not sufficient to demonstrate special damages. *See, e.g.*, Dkt. 13-5 ¶ 53.

Because the evidence proffered by Plaintiffs does not demonstrate that they have suffered special damages as a result of Defendant's trade libel, Plaintiffs have not presently shown a likelihood of success on their trade libel claim.

4.      Tortious Interference with Economic Advantage and Contract Claims

"Under California law, the elements for the tort of intentional interference with contractual relations are '(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'" *United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014) (quoting *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990)). "The elements for intentional interference with prospective economic advantage are essentially the same, just substituting an economic relationship with a contract." *Curtis v. Shinsachi Pharm. Inc.*, 45 F. Supp. 3d 1190, 1202 (C.D. Cal. 2014). "But in the latter type of claim, the interference must be 'independently wrongful,' that is, it must be 'proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.'" *Id.* (quoting *Edwards v. Arthur Andersen LLP,* 44 Cal. 4th 937, 944 (2008)); *see also Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998) ("Because interference with an existing contract receives greater solicitude than does interference with prospective economic advantage, it is not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself." (citation omitted)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

Plaintiffs have not presently shown a likelihood of success on their tortious interference with prospective economic advantage claim because, with the exception of the Password Claims, there is no present evidence that Defendant's conduct was wrongful. As explained previously, Plaintiffs have not met this burden as to the claims under the Lanham Act, the UCL or FAL, or common law trade libel. Although the false Password Claims could be deemed conduct that is "independently wrongful," they still do not furnish a basis for either tortious interference claim. For the same reasons as with Plaintiffs' trade libel claim, Plaintiffs have not adequately identified any specific contractual or economic relationships that were harmed due to the Password Claims. *See AccuImage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 957 (N.D. Cal. 2003) ("vague allegations" of economic relationships damaged are not sufficient for tortious interference with economic advantage); *Nat'l Specialty Pharmacy, LLC v. Padhye*, 734 F. Supp. 3d 922, 928 (N.D. Cal. 2024) (tortious interference with contract claim failed where the plaintiff "d[id] not specify what contracts were interfered with"); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1165–66 (2003) (proximate causation was satisfied where the plaintiff specifically alleged that its products were superior, and its bid was lower than the defendant's, such that the plaintiff would have been awarded the contract but for the defendant's tortious conduct).

The cases cited by Plaintiffs, Dkt. 13 at 23, are distinguishable. *BNI Enters., Inc. v. Referral Leaders Int'l, LLC*, No. 14-CV-2097, 2015 WL 12644984, at *7 (C.D. Cal. Jan. 9, 2015) (likelihood of success on tortious interference claims where advertising at issue "contained falsehoods," and the evidence showed that some customers "have broken their contractual relationship . . . based on the representations" that were proven false); *Brian Lichtenberg, LLC v. Alex & Chloe, Inc.*, No. 13-CV-6837, 2014 WL 3698317, at *7 (C.D. Cal. July 25, 2014) (reciting facts, noting that the "[d]efendants' position . . . is difficult to discern" and unclear, and therefore concluding that "intentional interference claims appear likely to succeed" without any underlying analysis); *Sweegen, Inc. v. Manus Bio Inc.*, No. 24-CV-1757, 2024 WL 4868290, at *6 (C.D. Cal. Oct. 24, 2024) (likelihood of success on tortious interference claims where libel had been found and "the analysis necessarily relies on the success of the libel claim").

For these reasons, Plaintiffs have not presently demonstrated a likelihood of success on the merits of their tortious interference claims.

\*        \*        \*

For those reasons, Plaintiffs have not demonstrated a likelihood of success on the merits of their claims based on the preliminary record.

####    B.    Other *Winter* Factors

Because Plaintiffs have not shown they are likely to succeed on the merits, the remaining *Winter* factors need not be addressed. *Garcia*, 786 F.3d at 740. However, at least two of them -- the balance of hardships and the public interest factors -- weigh against injunctive relief. *See, e.g.*, *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 805 (N.D. Cal. 2022) (declining to issue a preliminary injunction because, although there were "potentially strong arguments on both the merits and irreparable injury," the balance of equities and public interest weighed against injunctive relief).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | 2:26-CV-05530-JAK (MARx) | Date | July 20, 2026 |
|---|---|---|---|
| Title | Jika Inc., et al. v. Loop Solutions, Inc. | | |

Plaintiffs contend that the requested injunctive relief will not harm Defendant because it would only preclude Defendant from making "false" statements. Dkt. 13 at 26; Dkt. 23 at 14. The basis for this contention is Plaintiffs' arguments on the merits, which have been deemed insufficient at present to warrant preliminary injunctive relief. Accordingly, Defendant has a legitimate, commercial interest in informing those in the marketplace of potential changes to the nature and quality of service they will receive now that Skio is owned by Recharge, and the two of them control a large majority of the market. Dkt. 18-1, Ex. 1. *See Int'l Jensen v. Metrosound U.S.A.,* 4 F.3d 819, 827 (9th Cir. 1993) ("In evaluating the balance of hardships a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises. Thus[,] the relative size and strength of each enterprise may be pertinent to this inquiry.").

The requested injunction would bar Defendant from "suggesting" or "implying" that Skio's product and features may change in various ways due to the acquisition. Dkt. 13-21 at 2–4. Once again, this would impose a limitation on marketplace competition that could otherwise benefit customers. It would, in effect, preclude Defendant from responding to Plaintiffs' nonbinding commitment to maintain Skio as an independent service in the marketplace. This would impose limitations on Defendant in communicating to potential customers this and similar information that they could find useful in selecting service providers. *See CKE Rest. v. Jack in the Box, Inc.*, 494 F. Supp. 2d 1139, 1148 (C.D. Cal. 2007) (balance of hardships tipped in the defendant's favor when injunction would prevent the defendant from marketing its product in the manner it had chosen, and the plaintiff did not offer evidence of substantial harm).

For similar reasons, based on the current record, the public interest weighs against granting the requested injunctive relief. There is a strong public policy interest in permitting the free exchange of advertising information "as to who is producing and selling what product, for what reason, and at what price" because that information facilitates informed economic decision-making by consumers. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976). Advertising facilitates free competition among producers of goods and services. *CKE Rest.*, 494 F. Supp. 2d at 1141 ("The full and vigorous communication of product advertisement is an inherent and often helpful part of our free market economy."); *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 784 (1999) (Breyer, J., concurring in part and dissenting in part) (advertising restraints have obvious "anticompetitive tendencies" in antitrust analysis).

For these reasons, Plaintiffs have not demonstrated that the balance of the hardships or the public interest supports granting the requested injunctive relief based on the present record.

## VI.    Conclusion

For the reasons stated in this Order, the Motion is **DENIED**.

**IT IS SO ORDERED.**

|  |  | : |  |
|---|---|---|---|
| | Initials of Preparer | LC3 | |